1   NIALL P. McCARTHY (SBN 160175)
    nmccarthy@cpmlegal.com
2   ERIC J. BUESCHER (SBN 271323)
    ebuescher@cpmlegal.com
3   ADAM M. SHAPIRO (SBN 267429)
    ashapiro@cpmlegal.com
4   **COTCHETT, PITRE & McCARTHY, LLP**
    San Francisco Airport Office Center
5   840 Malcolm Road
    Burlingame, CA 94010
6   Telephone: (650) 697-6000
    Facsimile: (650) 697-0577
7
    *Attorneys for City of Los Angeles*
8

9                 **UNITED STATES DISTRICT COURT**

10              **EASTERN DISTRICT OF CALIFORNIA**

11

12   CITY OF LOS ANGELES *ex rel.* RICHARD     CASE NO. 2:17-cv-00810-TLN-AC
     KNUDSEN,
                                               **CITY OF LOS ANGELES'S OPPOSITION**
13                                             **TO CELLCO PARTNERSHIP d/b/a**
                   Plaintiff,                  **VERIZON WIRELESS'S MOTION TO**
14                                             **DISMISS THE CONSOLIDATED**
            v.                                 **COMPLAINT**
15   CELLCO PARTNERSHIP d/b/a VERIZON
     WIRELESS; and DOES 1-10,                  Date:    September 7, 2017
16                                             Time:    2:00 p.m.
                   Defendants.                 Ctrm:    2, 15th Floor
17                                             Judge:   Hon. Troy L. Nunley

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**CITY OF LOS ANGELES'S OPPOSITION TO VERIZON'S MOTION TO DISMISS**

## TABLE OF CONTENTS

Page No.

I.  INTRODUCTION ............................................................................................. 1

II.  BACKGROUND ............................................................................................. 1

III.  LEGAL STANDARD..................................................................................... 5

    A.  The False Claims Act is Construed Broadly.................................... 5

    B.  Rules 8(a) and 12(b)........................................................................ 6

    C.  Rule 9(b) ......................................................................................... 6

IV.  ARGUMENT ................................................................................................. 7

    A.  The City Was Entitled to Quarterly Optimization Reports................... 7

        1.  Principles of Contract Interpretation........................................7

        2.  City Contract I Requires Verizon to Provide Optimization and Optimization Reports ........................................................8

        3.  City Contract II Required Verizon to Provide Quarterly Optimization Reports ...........................................................9

            a.  The Plain Language of the Optimization Term Confirms the City's Reading ...............................................10

            b.  The City's View Is Consistent with the Purpose of Cooperative Purchasing Agreements and WSCA I's Structure ........................10

            c.  Verizon's Contrary Interpretation Is Unreasonable ......................11

        4.  City Contract III Required Verizon to Provide the City with Optimization Reports Upon Request ...................................13

    B.  Verizon's Claims Were Objectively False.......................................... 14

    C.  The City's Claims Are Pleaded with Sufficient Particularity.............. 17

    D.  The City May Plead Unjust Enrichment in the Alternative ............... 19

V.  CONCLUSION.............................................................................................. 19

1

**TABLE OF AUTHORITIES**

2

Page No(s).

**Cases**

3

*AIU Ins. Co. v. Superior Court,*

4
    51 Cal. 3d 807 (1990) ................................................................................ 7

5
*Ashcroft v. Iqbal,*

6
    556 U.S. 672 (2009) ................................................................................. 6

7
*Bell Atl. Corp. v. Twombly,*

8
    550 U.S. 544 (2007) ................................................................................. 6

9
*City of Pomona v. Superior Court,*
    89 Cal.App.4th 793 (2001) ...................................................................... 5

10
*Concept Chaser Co. v. Hoyu Am. Co.,*

11
    No. CV0807702ODWPLAX, 2009 WL 10673192, at *3 (C.D. Cal. Apr. 3, 2009) .................... 8

12
*Ebeid v. Lungwitz,*

13
    616 F.3d 993 (9th Cir. 2010) ............................................................. 6, 7

14
*Feller v. Transamerica Life Ins. Co.,*
    No. 216CV01378CASAJWX, 2016 WL 6602561, at *10 (C.D. Cal. Nov. 8, 2016) ................ 12

15
*Gaines v. Home Loan Ctr., Inc.,*

16
    No. SACV08667AHSRNBX, 2010 WL 11506442, at *7 (C.D. Cal. May 24, 2010) .................. 8

17
*Hartford Cas. Ins. Co. v. Swift Distribution, Inc.,*

18
    59 Cal.4th 277 (2014) .............................................................................. 7

19
*In re GlenFed Inc. Securities Litigation,*
    42 F.3d 1541 (9th Cir. 1994) ..................................................................... 6

20
*Klein v. Chevron U.S.A., Inc.,*

21
    202 Cal.App.4th 1342 (2002) .................................................................... 19

22
*Miller v. Glenn Miller Prods., Inc.,*

23
    454 F.3d 975 (9th Cir. 2006) .................................................................... 15

24
*Moyo v. Gomez,*
    32 F. 3d 1382 (9th Cir. 1994) ............................................................... 6, 17

25

26
*Odom v. Microsoft Corp.,*
    486 F.3d 541 (9th Cir. 2006) ..................................................................... 7

27
*Peel v. Brooksamerica Mortgage Corp.,*

28
    788 F. Supp. 2d 1149 (C.D. Cal. 2011) ....................................................... 6

*Starr v. Baca*,
   652 F. 3d 1202 (9th Cir. 2011) ................................................................. 6

*State of California ex rel. OnTheGo Wireless, LLC v. Cellco Partnership, et al.*,
   Case No. 34-2012-00127517 ............................................................... 5, 9

*Swartz v. KPMG LLP*,
   476 F.3d 756 (9th Cir. 2007) .................................................................. 18

*U.S. ex rel. Hagood v. Sonoma Cty. Water Agency*,
   929 F.2d 1416 (9th Cir. 1991) ................................................................ 16

*U.S. ex rel. Hendow v. Univ. of Phoenix*,
   461 F.3d 1166 (9th Cir. 2006) ................................................................ 16

*U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
   525 F.3d 370 (4th Cir.2008) ................................................................... 14

*U.S. v. Neifert-White Co.*,
   390 U.S. 228 (1968) ................................................................................. 6

*U.S. v. Webb*,
   655 F.2d 977 (9th Cir. 1981) .................................................................. 19

*United States ex rel. Campie v. Gilead Sciences*,
   2017 U.S. App. LEXIS 12163, at *28 (9th Cir. July 7, 2017) .................. 16

*United States ex rel. Chilcott v. KBR, Inc.*,
   No. 09-4018, 2013 U.S. Dist. LEXIS 153331, at *22–23 (C.D. Ill. Oct. 24, 2013) ................ 16

*United States ex rel. Oliver v. Parsons Co.*,
   195 F.3d 457 (9th Cir.1999) ................................................................... 16

*United States v. Corinthian Colls.*
   655 F.3d 984 (9th Cir. 2011) .................................................................. 18

*Wool v. Tandem Computers, Inc.*,
   818 F.2d 1433 (9th Cir. 1987) .................................................................. 7

**Statutes**

Cal. Bus. & Prof. Code § 17200 ...................................................................... 1

Cal. Civ. Code. § 1636 ..................................................................................... 7

Cal. Gov. Code § 12651 ................................................................................... 1

Cal. Gov. Code § 12655 (c) ............................................................................. 5

F.R.C.P. 8(a) .................................................................................................................... 6

F.R.C.P. 9(b) .......................................................................................................... 6, 7, 17

F.R.C.P. 12(b) .................................................................................................................. 6

F.R.C.P. 12(b)(6) .............................................................................................................. 6

F.R.C.P. 15(a)(2) ............................................................................................................ 19

I.    **INTRODUCTION**

Plaintiff City of Los Angeles (the "City") entered into contracts with Defendant Cellco Partnership d/b/a Verizon Wireless ("Verizon") for wireless airtime, data and equipment.  (ECF No. 1-1 (Consolidated Complaint in Intervention ("Complaint")) ¶ 1.)  As part of these contracts, Verizon agreed to provide the City with rate plan optimization on a quarterly or routine basis.  (*Id.* ¶ 4.)  Optimization is process through which Verizon was to identify the one rate plan among those offered for each wireless customer that would result in the lowest cost to the City.  (*Id.*)  Verizon also agreed to provide the City with wireless services at the "lowest cost available."  (*Id.*)  Taken together, these provisions required Verizon to provide the City with rate plan optimization reports that would permit it to purchase wireless services at the lowest cost available.  Verizon flouted these provisions, resulting in millions of dollars in overcharges to the City.  (*Id.* ¶¶ 5-7.)  To recover these losses, the City brought this action for violation of the California False Claims Act ("CFCA") (Cal. Gov. Code § 12651), violation of the Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code § 17200 et seq.), breach of contract, and unjust enrichment.

Verizon's motion to dismiss the Complaint should be denied.  Contrary to Verizon's assertions, the contracts at issue required Verizon to provide the City with optimization reports on a quarterly or routine basis.  Moreover, Verizon's statements relating to the provision of optimization and optimization reports can be proven objectively false, and thus the City has stated a claim under the CFCA.  Verizon's half-hearted contentions regarding the specificity of the Complaint largely ignore its detailed allegations concerning the manner in which Verizon perpetrated its fraudulent scheme, and are based on inapposite case law.  Finally, the motion to dismiss the City's claim for unjust enrichment should be denied because it is permissible for the City to plead that claim in the alternative.

II.   **BACKGROUND**

From 2006 to the present, the City purchased wireless services from Verizon under three cooperative purchasing agreements.  (Compl. ¶¶ 3, 46.)  Cooperative purchasing agreements allow multiple government customers to purchase under the same contract terms and conditions.  (*Id.* ¶ 13.)  The contracts at issue included a number of specialized provisions designed to reduce costs.

(*Id.* ¶ 4.)  Two specific cost saving provisions are relevant to this case.  First, the contracts required Verizon to provide rate plan optimization, a process for selecting the most effective means of reducing costs.  (*Ibid.*)  Rate plan optimization has a clear and widely accepted meaning in the wireless industry, and Verizon regularly provides this service to its large commercial customers. (*Id.* ¶ 6.)  It can save a customer from 20 to 30 percent on the cost of wireless services.  (*Id.* ¶¶ 1, 108.)  The optimization provisions in the contracts required Verizon to identify the one rate plan among the many offered for each wireless customer that would result in the lowest cost to the City. (*Id.* ¶ 4.)  Second, the contracts required Verizon to provide service at the "lowest cost available." (*Id.*)  These two provisions reinforce each other, and they also place an independent duty on Sprint to both offer optimization and the lowest cost available.

There are three cooperative purchasing agreements containing similar, but not identical, terms which are at issue in this case.  The first was negotiated by the State of California (the "State") and is referred to as the State of California Wireless Contract ("CWC").  (Compl. ¶ 3.) The CWC incorporated the State's electronic "Request for Proposals," referred to as "eRFP 5014," along with Verizon's responses thereto.  (Compl. ¶¶ 27, 40.)  The eRFP required Verizon to "work with the State to furnish quality wireless equipment and services at the lowest cost available." (Compl. ¶ 36.)  It also required Verizon to provide various reports, including a "quarterly optimization report for each wireless subscriber."  (Compl. ¶ 30, Verizon's Request for Judicial Notice ("Def.'s RJN") Ex. 2 at 83-84 (§ 5.11.2).)   While the reporting requirements in the CWC applied only to "State Departments" (Def.'s RJN Ex. 2 at 83 (§ 5.11)), the CWC did not preclude political subdivisions like the City from contracting for such reports themselves.

The City did just that.  Effective July 1, 2006, the City and Verizon entered into Contract Number 58608 ("City Contract I"), whereby Verizon agreed to "furnish and provide Wireless Telephone, Accessories and Airtime Services in accordance with" the CWC.  (Compl. ¶ 46; Def.'s RJN Ex. 1 at 4.)  City Contract I made one material change to the CWC, it required Verizon to provide rate plan optimization directly to the City.  Specifically the contract stated:

> Optimization:  After the initial plan assignment, Verizon Wireless will routinely identify those users who are not in the most optimized plan and work with the

City Department Telephone Coordinators to place users in the most optimized plan.

(Compl. ¶ 45; Def.'s RJN Ex 1 at 4.)  This provision required Verizon to provide rate plan optimization routinely — not sporadically and not only upon request — to City customers.

The other two cooperative purchasing agreements at issue were negotiated by the State of Nevada and referred to as the Western States Contracting Alliance ("WSCA") contracts — the first was in effect from 2006 to 2012 ("WSCA I") and the second went into effect in 2012 ("WSCA II."). (Compl. ¶ 48.)  The WSCA I and WSCA II request for proposals ("RFPs") and resulting contracts required Verizon to provide a "quarterly optimization report for each wireless service subscriber." (*Id.* ¶¶ 60, 71; Def.'s RJN Ex. 4 at p. 9 of 112 (§ 3.2.2); Def.'s RJN Ex. 8 at p. 12 of 64 (§ 3.3.2.2).)  The contracts also required Verizon to provide quality wireless equipment and services at the lowest cost available.  (Compl. ¶¶ 59, 70; Def.'s RJN Ex. 4 at p. 8 of 112 (§ 3.1.1); Def.'s RJN Ex. 8 at p. 10 of 64 (§ 3.1.2).)  Verizon certified that it read and understood the RFPs and that it agreed to comply with these requirements.  (Compl. ¶¶ 64, 69, 79.)  Verizon did not attempt to modify these requirements.  (*Id.* ¶¶ 76, 79.)

California executed Participating Addenda ("PAs"), which allowed state agencies and political subdivisions, including the City, to contract with Verizon and other carriers under the same terms and conditions that WSCA I and WSCA II guaranteed.  (Compl. ¶¶ 80-82, 91.)  In 2010, the State decided to use the WSCA regime exclusively for California agencies and not to renew the CWC.  (Compl. ¶ 84.)  The State issued a "Request for Offer" ("RFO") to various wireless carriers, including Verizon, so that California-specific terms could be negotiated for inclusion in the PAs.  (*Id.*)  The RFOs required carriers to provide "a quarterly optimization report for each wireless service subscriber."  (*Id.* ¶ 86, City of Los Angeles Request for Judicial Notice in Support of Opposition to Verizon's Motion to Dismiss ("Pl.'s RJN") Ex 1 at p. 24 (§ 7.16.2).)

On October 29, 2010, the parties amended City Contract I to extend it until April 2, 2011 in accordance with WSCA I.  (Def.'s RJN Ex. 3.)

Effective September 1, 2011, the City and Verizon entered into an agreement ("City Contract II") expressly adopting the terms of the WSCA I contract, including the requirement that Verizon provide quarterly optimization reports.  (Compl. ¶ 96; Def.'s RJN Ex. 6.)  Specifically,

City Contract II states:  "This Contract is awarded as a Cooperative Purchase Arrangement, in accordance with . . . the prices, terms and conditions stated in [WSCA I]."  (Def.'s RJN Ex. 6 at 3.)

City Contract II was replaced by Contract Number 59464, effective March 1, 2013 ("City Contract III"), which adopted the prices, terms and conditions of the WSCA II Contract.  (Compl. ¶ 96; Def.'s RJN Ex. 7.)  As to optimization, City Contract III provided:

> Reports; Plan Optimization. Any reports to be provided by Verizon Wireless under this Agreement will be in a format and contain such content as may be mutually agreed to by Verizon Wireless and The City of Los Angeles.  Verizon Wireless shall not be required to provide any usage or other reports except upon specific written request by City's Purchasing Agent or an Authorized Contact on the account/profile for which a report is requested.  Verizon Wireless shall not be required to provide rate optimization reports except upon specific written request by an Authorized Contact on the account/profile for which a report is requested.

(Def.'s RJN Ex. 7 at 4; *see also* Compl. ¶ 96.)

Verizon failed to give the City the benefit of the bargain, as it failed to provide the required quarterly optimization reports, even upon request of the City.  (Compl. ¶¶ 97-98.)  Instead, Verizon produced infrequent reports related to rate plan selections, which did not provide the same information found in a true optimization report.  (*Id.* ¶¶ 100–101, 103-105, 107, 119.)  Verizon passed off some of these reports as optimization reports, misrepresenting their value to the City. (*Id.* ¶ 119.)  Verizon contacted a rate plan optimization firm, eOnTheGo, about preparing the reports the CWC and WSCA contracts required, but a Verizon employee later told eOnTheGo that senior Verizon executives refused to fund the optimization work and decided not to prepare optimization reports.  (*Id.* ¶ 118.)

Throughout this whole process, Verizon acted knowingly.  (Compl. ¶132-135.)  Verizon made false and materially misleading representations to secure the contracts. (*Id.*)  Verizon misrepresented that it would provide rate plan optimization, knowing full well what it requires. (*Id.*)  It then failed to take any necessary action to fulfill their commitments. (*Id.*)

This case was filed by *Qui Tam* Plaintiff Richard Knudsen in Los Angeles County Superior Court in September 2013.  (ECF No. 1-1.)  Along with this case, Knudsen filed two additional cases against AT&T and Sprint.  The three cases were consolidated together in Los Angeles County Superior Court and the City filed a consolidated complaint in intervention in September

1  2016 against all three defendants.  The City asserts causes of action for violation of the CFCA,

2  unfair business practices in violation of the UCL, breach of written contract, and unjust

3  enrichment.  (Compl. ¶¶ 142-166.)  Each Defendant removed the cases to the United States

4  District Court for the Central District of California.  (ECF No.1.)  On the City's motion, the case

5  was transferred to this Court.  (ECF No. 53.)  Verizon filed its motion to dismiss on July 6, 2017.

6  (ECF No. 67.)

7       Verizon, as well, as AT&T and Sprint, have also been named as defendants in a similar

8  action now pending in Sacramento Superior Court, *State of California ex rel. OnTheGo Wireless,*

9  *LLC v. Cellco Partnership, et al.*, Case No. 34-2012-00127517 ("*OnTheGo*").  The Plaintiffs in

10  *OnTheGo* include over 40 political subdivisions and the Regents of the University of California.

11  As in this case, the *OnTheGo* plaintiffs have asserted claims for violation of the CFCA, unfair

12  business practices, and breach of contract based on agreements adopting the terms of the CWC,

13  WSCA I, and WSCA II agreements.  (Pl.'s RJN Ex. 2.)  The superior court overruled Verizon's

14  demurrer to the *OnTheGo* Plaintiff's Second Amended Complaint, which raised many of the same

15  arguments Verizon has made here.  (Pl.'s RJN Ex. 3.)

16  **III.   LEGAL STANDARD**

17       **A.   The False Claims Act is Construed Broadly**

18       The proper judicial interpretation of the CFCA is embodied in the statutory scheme itself.

19  The CFCA must be "liberally construed and applied to promote the public interest."  Gov. Code, §

20  12655, subd. (c).  "[I]nasmuch as the False Claims Act obviously [is] designed to prevent fraud on

21  the public treasury, it plainly should be given the broadest possible construction consistent with

22  that purpose."  *City of Pomona v. Superior Court*, 89 Cal.App.4th 793, 801–802 (2001) (internal

23  quotations omitted, emphasis added).  The CFCA " 'must be construed broadly so as to give the

24  widest possible coverage and effect to the prohibitions and remedies it provides.' "  *Id.* (emphasis

25  added).  The statute is " 'intended to reach all types of fraud, without qualification, that might

26  result in financial loss to the Government.' "  *Id.* at p. 802 (emphasis added).  Given the "very

27  close similarity" of the CFCA to the Federal False Claims Act (FCA), California courts turn to

28  federal cases for guidance in interpreting the CFCA.  *Id.*  The FCA "reaches beyond 'claims'

1  which might be legally enforced, to <u>all fraudulent attempts</u> to cause the Government to pay out

2  sums of money." *U.S. v. Neifert-White Co.*, 390 U.S. 228, 233 (1968) (emphasis added).

3  **B.    Rules 8(a) and 12(b)**

4  "[Federal Rule of Civil Procedure] Rule 12(b)(6) is read in conjunction with Rule 8(a),

5  which requires only a short and plain statement of the claim showing that the pleader is entitled to

6  relief." *Peel v. Brooksamerica Mortgage Corp.*, 788 F. Supp. 2d 1149, 1157 (C.D. Cal. 2011). A

7  complaint need only allege "enough facts to state a claim to relief that is plausible on its face," *Bell*

8  *Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), or allege sufficient facts to "raise a right to relief

9  above the speculative level," *id.* at 555. The Court must accept as true all allegations of material

10  facts alleged in the complaint, and must draw all inferences in the light most favorable to the non-

11  moving party. *Moyo v. Gomez*, 32 F. 3d 1382, 1384 (9th Cir. 1994).

12  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more

13  than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 672,

14  678 (2009) (quoting *Twombly*). "If there are two alternative explanations, one advanced by

15  defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint

16  survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F. 3d 1202, 1216 (9th Cir.

17  2011), *cert. denied*, 132 S. Ct. 2101 (2012).

18  **C.    Rule 9(b)**

19  Rule 9 on its face does not apply to the *scienter* requirement of the false claims act. *See*

20  Rule 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged

21  generally"); *see also In re GlenFed Inc. Securities Litigation*, 42 F.3d 1541, 1547 (9th Cir. 1994)

22  (*en banc*) ("We conclude that plaintiffs may aver *scienter* generally, just as the rule states — that

23  is, simply by saying that *scienter* existed"). With respect to FCA complaints, in *Ebeid v. Lungwitz*,

24  616 F.3d 993 (9th Cir. 2010), the Ninth Circuit rejected a stringent pleading standard under Rule

25  9(b) and stated:

26  > We **do not** embrace the district court's categorical approach that would, as a matter
27  > of course, require a plaintiff to identify representative examples of false claims to
>    support every allegation . . . . **[I]t is sufficient to allege "particular details of a**
>    **scheme to submit false claims paired with reliable indicia that lead to a strong**
28  > **inference that claims were actually submitted."** [Citation].

*Ebeid*, 616 F.3d at 998-99 (emphasis added).  Moreover, "the requirements of Rule 9(b) relax 'as to matters peculiarly within the opposing party's knowledge.' " *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987).  Rule 9(b) merely "requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations."  *Odom v. Microsoft Corp.*, 486 F.3d 541, 555 (9th Cir. 2006).

**IV.**   **ARGUMENT**

   **A.**   **The City Was Entitled to Quarterly Optimization Reports**

   Verizon does not appear to dispute it was required to provide the City with rate plan optimization under the relevant contracts.  Nor does Verizon dispute that optimization involves providing reports to its customers or that Verizon was required to provide services and equipment at the "lowest cost available."  Verizon nevertheless contends that some aspects of one or more of the City's claims should be dismissed because Verizon was not contractually obligated to provide "quarterly optimization reports."   (Verizon's Memorandum of Points and Authorities in Support of Motion to Dismiss ("MPA") at 13-14.)  Verizon's interpretation is contrary to the plain meaning of the contractual language.

   **1.**   **Principles of Contract Interpretation**

   Under California law, a contract must be interpreted to "give effect to the mutual intention of the parties as it existed at the time of contracting."  Cal. Civ. Code. § 1636.  The parties' intent "is to be inferred, if possible, solely from the written provisions of the contract."  *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990).  "In determining this intent, [t]he rules governing policy interpretation require [the court] to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it.  [The court] consider[s] the clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage.  [The court] must also interpret the language in context, with regard to its intended function. . . ."  *Hartford Cas. Ins. Co. v. Swift Distribution, Inc.*, 59 Cal.4th 277, 288 (2014).

   A breach of contract claim should only be dismissed where "the agreement is not susceptible to **any** interpretation that could support plaintiffs' theories of liability."  *Gaines v.*

1   *Home Loan Ctr., Inc.*, No. SACV08667AHSRNBX, 2010 WL 11506442, at *7 (C.D. Cal. May 24,

2   2010) (emphasis added).  " 'So long as the pleading does not place a clearly erroneous construction

3   upon the provisions of the contract, in passing upon the sufficiency of the complaint, [the court]

4   must accept as correct plaintiff's allegations as to the meaning of the agreement.' "  *Concept*

5   *Chaser Co. v. Hoyu Am. Co.*, No. CV0807702ODWPLAX, 2009 WL 10673192, at *3 (C.D. Cal.

6   Apr. 3, 2009).

### 2.   City Contract I Requires Verizon to Provide Optimization and Optimization Reports

8       As part of City Contract I, Verizon agreed to "routinely identify those users who are not in

9   the most optimized plan and work with the City . . . to place users in the most optimized plan."

10  (Def.'s RJN Ex. 1 at 4.)  This necessarily required Verizon to provide the City with routine

11  optimization reports which identified those users who were not in the most optimized plans.

12  Additionally, City Contract I was later amended to incorporate the terms of the WSCA I

13  agreement, which expressly required Verizon to provide quarterly optimization reports.  (Def.'s

14  RJN Ex. 4 at p. 9 of 112 (§ 3.2.2) .)   Verizon nevertheless contends that the City was not entitled

15  to optimization reports under City Contract I.  (MPA at 14-15.)  Verizon's contention cannot be

16  squared with City Contract I's plain language.  And Verizon cannot get around WSCA I's

17  reporting provisions for the time period during which City Contract I incorporated the terms of that

18  cooperative purchasing agreement.

19      City Contract I was initially awarded as a cooperative purchasing agreement in accordance

20  with the CWC.  (Def.'s RJN Ex. 1 at 1.)  The City concedes that the CWC itself does not expressly

21  require Verizon to provide quarterly optimization reports, because the CWC RFP's mandatory

22  requirement that wireless carriers provide quarterly optimization reports applies to "State

23  departments and not to local agencies."  (Def.'s RJN Ex. 2 at pp. 83-84 (§§ 5.11, 5.11.1).)

24  However, nothing in the CWC precluded the City from contracting for optimization or

25  optimization reports.  The City did so, executing City Contract I with Verizon which required the

26  carrier to "routinely identify those users that are not in the most optimized plan and work with the

27  City Department Telephone Coordinators to place users in the most optimized plan."  (Def.'s RJN

28  Ex. 1 at 3.)

As explained in the Complaint, optimization reports are an integral part of optimization. Optimization is the process for selecting the most cost-effective plan for a wireless device. Identifying the most cost-effective plan is technical, and requires detailed and historical usage data, a complete list of all available rate plans, and a means to match up the usage with the optimal plan. (Compl. ¶ 21.)  "The value of rate plan optimization is in the analysis of [the] usage data and potential plan matchups."  (Compl. ¶ 101.)  Optimization reports are the primary means of providing this analysis.  (*Id.* ¶¶ 97-107.)  Thus, in the absence of routine optimization reports, there was no way for Verizon to fulfill its contractual obligation to "routinely identify" users who were not in the most optimized plan and place those users in the most optimized plan.[1]

Moreover, City Contract I was later amended to incorporate the terms of WSCA I.  (Def.'s RJN Ex. 3.)   As discussed, the WSCA I RFP expressly required Verizon to provide quarterly optimization reports.  (Def.'s RJN Ex. 4 at p. 9 of 112 (§ 3.2.2.2).)  Verizon argues that this provision did not extend to the City, but only to Nevada.  As shown in Section IV.A.3 below, that is simply not the case.

### 3.	City Contract II Required Verizon to Provide Quarterly Optimization Reports

City Contract II was awarded as a cooperative purchase agreement "in accordance with" the WSCA I.  (Def.'s RJN Ex. 6.)  That WSCA agreement expressly required Verizon to provide a "quarterly optimization report for each wireless service subscriber."  (Def.'s RJN Exs. 4 at 9 of 112 (§ 3.2.2.2).)  Verizon now argues that WSCA I's optimization-reporting provision did not extend to the City, but only to the "lead state" of Nevada.  (MPA at 15-16.)  The Sacramento Superior Court rejected the same argument when it overruled Verizon's demurrer in *OnTheGo*. (Pl.'s RJN Ex. 3 at 14-15.)  This Court should do the same.  The plain language of WSCA I and its purpose and structure support the City's reading.  Moreover, Verizon's contrary interpretation of WSCA is entirely unreasonable and is based on incomplete and misleading extrinsic evidence.

---

[1] At the very least, Verizon's argument cannot be resolved on a motion to dismiss as it requires consideration of matters outside the pleadings, including the relationship between optimization and optimization reports.

**CITY OF LOS ANGELES'S OPPOSITION TO VERIZON'S MOTION TO DISMISS**          9

### a. The Plain Language of the Optimization Term Confirms the City's Reading

The text of the WSCA optimization provision supports the City's entitlement to optimization reports.  The RFPs for WSCA I state that four different reports "shall be submitted for the respective quarter" by Defendants, including a "[q]uarterly optimization report for each wireless service subscriber."  (See Def.'s RJN Exs. 4 at p. 9 of 112 (§ 3.2.2.2).)

On its face, the language requires Defendants to provide political subdivisions, including the City, with optimization reports.  Further, the WSCA I RFP broadly defines "subscriber" without regard to whether the customer is a state or political subdivision:  A "subscriber" is simply a "using entity who contracts to receive and pay for wireless or walkie-talkie services."  (See Pl.'s RJN, Ex. 4 at p. 7 of 112.)  Because the City purchased services under WSCA I (Compl. ¶ 96), it was a "subscriber" to whom Verizon owed quarterly optimization reports.

Moreover, the responses Verizon submitted to the WSCA RFPs demonstrate that it understood the optimization reporting obligation extended to all purchasers, not just Nevada.  Specifically, Verizon represented in its response that it would provide quarterly optimization reports "as part of a Quarterly Business Review," and touted that it would include "personalized recommendations on price plans and equipment based on analysis of the data."  (Compl. ¶ 119.) Verizon did not do so for the City.

### b. The City's View Is Consistent with the Purpose of Cooperative Purchasing Agreements and WSCA I's Structure

The City's interpretation is consistent with the optimization provision's purpose in the context of cooperative purchasing agreements like WSCA I and II.  Cooperative purchasing agreements pool "the collective market power [of] government entities" and offer vendors "instant access to the large and lucrative government market."  (Compl. ¶ 17.)  Such agreements "provide[] benefits with respect to the procurement of products and services that require technical expertise. Having a single entity develop the contract saves time and money, including the effort required to learn about complicated services and develop specialized terms."  (*Id.* ¶ 16.)  Nevada negotiated master contracts that required Verizon to provide government purchasers with quarterly optimization reports.  (*Id.* ¶ 48.)  Optimization is a common industry practice that saves from 20 to

30 percent on the cost of wireless services by ensuring that each wireless line is subscribed to the most cost-efficient rate plan available.  (*Id.* ¶¶ 1, 108.)  It stands to reason that a cooperative purchasing agreement that includes such a major cost saving provision would extend that benefit to the hundreds (potentially thousands) of government entities that purchase services under it.

Bolstering this view, WSCA I expressly confers on political subdivisions the same rights that Nevada and other purchasers enjoy.  The Standard Terms and Conditions in the WSCA I RFP, for example, require carriers "to supply the political subdivisions based upon the same terms, conditions and prices" as other purchasers under the agreement.  (*See* Def.'s RJN Ex. 4 at p. 51 of 112 ("Political Subdivision Participation").)

The terms of California's PA also confirm that the right to quarterly optimization reports extends to political subdivisions.  The purpose of a PA is to afford "each party" using the WSCA contracts "the protection of [the contracts'] terms and conditions."  (Compl. ¶ 80.)  California's PA, which covered political subdivisions, incorporated the terms of the WSCA I; it did not amend Verizon's obligations to provide quarterly optimization reports to exclude political subdivisions.[2] (*Id.* ¶ 83.)

These contractual provisions complement one another:  Terms that put political subdivisions on equal footing with all other purchasers reinforce the RFPs' provision that requires Verizon to provide quarterly optimization reports "for each . . . subscriber."  All told, these provisions support the City's analysis that the optimization reporting requirement includes political subdivisions.

### c. Verizon's Contrary Interpretation Is Unreasonable

To defeat a motion to dismiss concerning disputed contractual terms, the City must show only that its interpretation of the contract is reasonable.  *See Feller v. Transamerica Life Ins. Co.*,

---

[2] The RFO California issued in November 2010 in connection with WSCA I and the related PAs did not alter Verizon's obligation to provide optimization reports to political subdivisions. (Compl. ¶ 85-86.)  The RFO elaborates California specific terms governing the contractual relationship between Verizon, on the one hand, and California and its agencies, on the other.  (*Id.*) With respect to optimization, the RFO requires Verizon to "provide a quarterly optimization report for each wireless service subscriber," and "to submit this report to the State's Contract Administrator and may[]be to the ATRs."  (*Id.* ¶ 86; s*ee also* Pl.'s RJN Ex. 1 at 24-25 (§ 7.16.2.). The RFO supplements WSCA I's requirement that Verizon must provide quarterly optimization reports to political subdivisions; it does not revoke or abrogate that existing obligation.

1   No. 216CV01378CASAJWX, 2016 WL 6602561, at *10 (C.D. Cal. Nov. 8, 2016) (" '[w]hen

2   reviewing whether a plaintiff has properly stated a cause of action for breach of contract, we must

3   determine whether the alleged agreement is "reasonably susceptible" to the meaning ascribed to it

4   in the complaint' ").  The City has done so.  Although it is not the City's legal burden to establish

5   that Verizon's contract construction is in error, the City is nonetheless compelled to explain why it

6   cannot stand.

7       Verizon contends that the optimization reporting requirement is limited to Nevada alone

8   based on a single item of evidence proffered as part of Verizon's RJN.  Verizon contends that

9   Nevada gave an answer to a question posed during the RFP process (the "Q&A") that amended

10  WSCA I to deprive government customers other than Nevada of the cost savings optimization

11  yields.  (MPA at 15-16, citing Def.'s RJN Ex. 5.)  The Q&A did nothing of the sort. Moreover, the

12  evidence Verizon asks the Court to judicially notice and interpret is incomplete at best and

13  misleading at worst, as it omits the most significant portion of the response, "Attachment F."

14      The Q&A at issue, which refers to Section 3.2.2.2 in the WSCA I RFP, consists of the

15  following exchange:

16

17      [Question 48:] Please explain what level of detail is required for the reports
        referenced in Section 3.2.2.2. Also, should these reports be submitted to the Lead
18      State and/or all the participating WSCA states.

19      [Answer:] Please refer to Attachment F—Quarterly Reports. Reports should be
        submitted to the Lead State [Nevada].
20

21  Def.'s. RJN, Ex. 5 at 9.

22      Verizon cannot escape the fact that the question does not focus on, let alone mention,

23  optimization reports.  Instead, it refers to the entirety of Section 3.2.2.2, which describes four

24  separate reports, without pinpointing which one the question concerns.  Moreover, the attachment

25  referenced in the "answer," which is not included in Verizon's RJN — is critically important as it

26  is a sample quarterly "Administrative Report."  *(See* Pl.'s RJN, Ex. 4.)  The reference in the

27  answer to a Quarterly Administrative Report definitely establishes that the Q&A has nothing to do

28  with optimization reports.

1    In exchange for negotiating and administering the WSCA agreements for the benefit of

2  hundreds of government entities and wireless carriers, the WSCA RFP provided that Verizon and

3  other carriers would pay Nevada a quarterly "Administration Fee" equal to 0.0010 percent of the

4  revenue they received from customers utilizing the WSCA contract.  (*See* Def.'s RJN Ex. 5 at 2-3

5  (Questions 6 & 10).)  Carriers were required to provide quarterly reports setting out the revenue

6  they received and calculating the fee they owed.  (See *id.*; Def.'s RJN Ex. 4 at pp. 8-9 of 112 (§

7  3.2.1.3).)  Attachment F is the form used to report the administrative fee Verizon owed containing

8  cells for "Gross Total Sales," the "WSCA Admin Fee Rate" of 0.0010 percent, and a total "WSCA

9  Admin Fee."  In short, Verizon could only use Attachment F to report "[u]sage and purchases

10  under the contract," the first of the four reports described in Section 3.2.2.2.  On its face, it could

11  not be used for any other report referenced there, including optimization reports.[3]

12    Moreover, Verizon's interpretation of the contracts does not make sense, as it is premised

13  on the idea that Nevada was to receive reports concerning City employees.  As discussed,

14  optimization reports are a key aspect of the optimization services promised by Verizon, since they

15  provide information about City employees that are not in cost effective plans.  While these reports

16  are of great use to the City, it is unclear why Nevada would need or want them, or what it could

17  possibly do with information concerning subscribers with which it has no connection.

**4.    City Contract III Required Verizon to Provide the City with Optimization Reports Upon Request**

20    Verizon asserts that City Contract III did not require it to provide quarterly optimization

21  reports or optimization reports of any kind, regardless of whether they were requested.  (MPA at

22  16.)  The argument may be easily rejected.  The plain language of contract required Verizon to

23  provide optimization reports upon request.  (Def.'s RJN Ex. 7 at 3.)  Specifically, City Contract III

24  states:

> "Reports; Plan Optimization. . . .  Verizon Wireless shall not be required to provide
> any usage or other reports except upon specific written request by City's Purchasing
> Agent . . . .  Verizon Wireless shall not be required to provide rate optimization
> reports except upon specific written request by an Authorize Contact."

---

[3] Moreover, Sprint has offered no indication that in fact provided optimization reports to
Nevada.  Thus, even if Sprint's interpretation of the contract is correct — it is not — Sprint still
breached the terms of the agreement.

(*Id.*)

Verizon's arguments on this point are misleading in that they quote language from one of the City's contracts with Sprint, not from City Contract III.  (MPA at 16.)  This appears to be a result of Verizon's decision to copy almost all of the language in its motion from Sprint's earlier filed motion to dismiss.  (*Compare* MPA *with* Case No. 17-cv-00811 ECF No. 82.)  But Sprint's contracts with the City are not identical to its Verizon's.

Verizon further argues that dismissal is warranted because the City has not pleaded that it requested optimization.  (MPA at 8.)  Not so.  The City specifically alleged that Verizon "sporadically prepared reports related to rate plan selections, *often in response to requests from City departments or representatives*," but those reports did not contain the information required by the relevant contracts.  (Compl. ¶ 98.)

## B.    Verizon's Claims Were Objectively False

The Court should also reject Verizon's contention that the City's CFCA claims should be dismissed because the relevant contractual terms are too ambiguous to support a finding of falsity.  (*See* MPA at 17-19.)  It is true that allegations of violations of "vague," "imprecise," or "subjective" contractual terms generally do not give rise to objective falsehoods and thus cannot serve as the basis for liability under the CFCA.  S*ee U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376–377 (4th Cir.2008).  However, the false statements alleged here are objectively false, and the contractual terms that were violated are in no way vague, imprecise, or subjective.

As an initial matter, the City alleges more than a breach of contract claim.  The allegations of the Complaint show that Verizon submitted false claims by:  (1) certifying in each claim for payment that it was in compliance with provisions concerning optimization, optimization reporting, and providing services at the lowest cost available, when Verizon knew it was not in fact in compliance; and (2) fraudulently inducing the City to enter into the relevant agreements by representing that it could provide optimization services and services at the lowest cost available when it had no intention or ability to do so.  (Compl. ¶¶ 110, 135-136, 144, 149.)

1    Contrary to Verizon's contentions, its certifications regarding optimization are objectively

2  false. [4]   The contracts' requirement that Verizon provide optimization reports on a quarterly or

3  routine basis is not vague, and Verizon's compliance with this term can be objectively assessed —

4  Verizon either provided the required reports or it didn't.  Moreover, as shown in Section IV.A

5  *supra*, there is only one reasonable interpretation of the contracts reporting provisions.  For

6  example, the WSCA I agreement, the terms of which are incorporated into City Contracts I and II,

7  expressly requires Verizon to provide a "quarterly optimization report for each wireless service

8  subscriber."  (Def.'s RJN Ex. 4 at p. 9 of 112 (§ 3.2.2.2).)  To the extent there is any ambiguity in

9  the plain language of the contracts — there is not — the Court may consider extrinsic evidence to

10  determine the parties' intent.  *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 990 (9th Cir.

11  2006).  It is premature at this stage to consider such extrinsic evidence, let alone determine

12  whether it gives rise to a disputed legal issue.

13    Likewise, the contracts' requirement that Verizon provide optimization is also sufficiently

14  concrete to support a finding of objective falsity.  Verizon argues that the provisions in City

15  Contract I requiring Verizon to "routinely identify those users who are not in the most optimized

16  plan" and "work with the City . . . to place those users in the most optimized plan" are too

17  imprecise to support an FCA claim.  (MPA at 19.)  Specifically, Verizon takes aim at the terms

18  "routinely identify," "work with," or "most optimized."  (*Id.*)  But Verizon cannot plausibly

19  contend that it "routinely identif[ied]" users who were not in the most optimized plan if it only did

20  so sporadically or if it never did so at all.  Nor can Verizon contend that it "work[ed] with the

21  City" if it made no attempt to reach out to the City to provide optimization.  And while term

22  "optimize" may not have been defined in the contracts, as alleged in the complaint, it has a clear

23  and widely accepted meaning in the wireless industry.  (Compl. ¶ 6.)  Thus, determining whether

24  Verizon provided optimization is an objective inquiry.

25    Verizon argues that differences of interpretation cannot give rise to liability, and that an

26  ambiguous contract can never give rise to a false claims action.  However, whether the contract

27  interpretation Verizon now proffers is reasonable does not resolve whether it knowingly submitted

28
_____

[4] Verizon does not dispute that "lowest cost available" provisions are sufficiently precise to support an FCA claim.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1   false claims; that a defendant in litigation can come up with an alternative interpretation of a

2   contract or regulation does not preclude a finding that a false claim was knowingly or recklessly

3   submitted, because to do so ignores a defendant's intent.  If Verizon's argument were correct, it

4   "could submit a claim, knowing it was false, or at least with reckless disregard of its falsity, thus

5   meeting the intent element, but nevertheless avoid liability by successfully arguing that its claim

6   reflected a 'reasonable interpretation' of the requirement and was therefore 'not false.' "  *United*

7   *States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 463 n.3 (9th Cir.1999).

8          Regardless, whether Verizon understood the contract in the way that the City alleges is not

9   a matter for a motion to dismiss.  The Complaint alleges how Verizon understood the requirement,

10  based on the specific words Verizon used and its actions in other contexts; those allegations must

11  be taken as true.  If Verizon wishes to show it actually had a different understanding, it is free to

12  do so at the appropriate time—following discovery.  *See U.S. ex rel. Hagood v. Sonoma Cty.*

13  *Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) (defendant's "comforting conclusion" that it

14  could not have known it made a false statement because of its differing interpretation of the

15  underlying contract "cannot be reached by mere inspection of [relator's] complaint"); *United*

16  *States ex rel. Chilcott v. KBR, Inc.*, No. 09-4018, 2013 U.S. Dist. LEXIS 153331, at *22–23 (C.D.

17  Ill. Oct. 24, 2013) (refusing to "make a final decision" as to either contractual interpretation or

18  defendant's intent on a motion to dismiss because "[t]he Court's only role at this stage is to

19  determine whether Plaintiff's allegations, taken as true, are sufficient to raise a claim under the

20  FCA").

21         Moreover, Verizon's arguments have no bearing on the City's fraudulent inducement

22  theory of liability.  "This theory, rather than specifically requiring a false statement of compliance

23  with government regulations [or contractual provisions], is somewhat broader.  It holds that

24  liability will attach to each claim submitted to the government under a contract, when the contract

25  or extension of government benefit was originally obtained through false statements or fraudulent

26  conduct."  *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1173 (9th Cir. 2006); *see also*

27  *United States ex rel. Campie v. Gilead Sciences*, 2017 U.S. App. LEXIS 12163, at *28 (9th Cir.

28  July 7, 2017) (relator adequately alleged promissory fraud under the FCA where defendant

1    fraudulently obtained FDA approval of drug, and thus each claim was fraudulent even if false

2    representations were not made in the claims for reimbursement themselves).  As alleged in the

3    Complaint, Verizon had no intention of complying with the optimization provisions contracts

4    when it agreed to them.  (Compl. ¶¶ 110, 119.)

5         **C.    The City's Claims Are Pleaded with Sufficient Particularity**

6              Verizon's contention that the complaint does not meet Rule 9(b)'s pleading standards

7    should also be rejected.  The 166-paragraph Complaint specifically alleges Verizon's false

8    statements, the particular individuals who made them, when they were made, as well as why they

9    were false.  (*See*, *e.g.*, Compl. ¶¶ 97-107, 116-119, 125-126.)  Verizon entirely disregards these

10   detailed factual allegations, as well as the requirement that the Court draw all inferences in the

11   light most favorable to the plaintiff on a motion to dismiss.  *See Moyo*, 32 F. 3d at 1384.  Each of

12   Verizon's arguments is addressed below.

13             **First**, Verizon once again asserts that the City cannot base its claims on Verizon's failure

14   to provide quarterly optimization reports because, according to Verizon, it was not required to

15   provide such reports.  (MPA at 19-20.)  This argument fails for the reasons set forth in Sections

16   IV.A-B, *supra*, and has no bearing on Rule 9(b)'s particularity requirement.

17             **Second**, Verizon contends the Complaint impermissibly lumps it together with the other

18   two defendants, AT&T and Sprint.  (MPA at 20-21.)  The argument rings hollow.  The City's

19   allegations concerning Verizon's misconduct are straightforward:  Verizon failed to comply with

20   its express contractual obligations by failing to provide optimization while falsely represented that

21   it had in fact done so.  There is no ambiguity about Verizon's role in the fraud, as there is no

22   allegation that it acted in concert with anyone else.

23             The City also alleges that each the other two defendants engaged in an almost identical

24   scheme, but they did so independent of Verizon.  Verizon essentially argues that because the City

25   sometimes alleges that all three defendants acted in the same way, without singling out each

26   defendant by name, the Complaint lacks the requisite particularity.  However, the fact that the City

27   sometimes refers to AT&T, Sprint, and Verizon collectively when describing actions that all three

28   took in no way undermines the specificity of the pleading.  Amending the Complaint to add

1  identical allegations for each defendant might address Verizon's complaints, but it serves no

2  practical purpose other than to make the pleading longer.

3         In any event, the Complaint does differentiate between the defendants.  As an initial matter,

4  the Complaint describes the cooperative purchasing agreements executed by Verizon, the

5  agreements Verizon entered into directly with the City, the representations Verizon employees

6  made when Verizon entered into these agreements, and why these representations were false.  (*See*,

7  *e.g.*, Compl. ¶¶ 97-107, 116-119, 125-126.)  The Complaint also describes how Verizon in

8  particular failed to provide rate plan optimization.  (Compl. ¶¶ 97-107, 116-119.)  For example, a

9  Verizon employee told OnTheGo that senior Verizon executives refused to fund optimization work

10  for the City and decided not to prepare optimization reports.  (*Id.* ¶ 118.)   The City also alleges

11  that Verizon, as well as Sprint, disseminated raw usage reports, but those reports did not comply

12  with the contractual requirement to prepare optimization reports.  (Compl. ¶ 103.)

13         Moreover, Verizon's authority on this point is inapposite as it relates to circumstances

14  where a plaintiff alleges that multiple officers or employees of a corporation participated or

15  conspired together in a single fraudulent scheme, but the plaintiff fails to identify the role of each

16  individual defendant in that scheme.  (MPA at 20 (citing *United States v. Corinthian Colls.* 655

17  F.3d 984, 997-998 (9th Cir. 2011); *Swartz v. KPMG LLP*, 476 F.3d 756, 764-765 (9th Cir. 2007)).)

18  In contrast, here, the City alleges that each of the defendants perpetrated its own independent fraud

19  by failing to provide optimization.  (Compl. ¶¶ 1, 5, 6.)  Unlike *Swartz* and *Corinthian*, this is not a

20  case where several individuals are alleged to have worked or conspired together to commit fraud,

21  and thus there is no need to "identify the role of each defendant in the alleged fraudulent scheme."

22  *See Swartz*, 476 F.3d at 765 (internal quotations and citations omitted).

23         **Third**, Verizon takes out of context various allegations of the Complaint in a failed attempt

24  to show inconsistencies in the pleading.  (MPA at 21.)  For example, Verizon argues that the City's

25  allegation that Verizon was unwilling or unable to "routinely identify" users who were not in the

26  most optimal plan is inconsistent with its allegation that Verizon "sporadically" prepared reports

27  related to rate plan selections.  (*Id.*)  However, in the latter allegation, the City explains that the

28  reports in question were insufficient in both their "substance" and "frequency," and thus did not

1  satisfy Verizon's contractual obligation to provide optimization on a routine or quarterly basis.

2  (Compl. ¶ 98.)  Verizon further argues that these deficient reports somehow establish that Verizon

3  satisfied its obligations to "work with the City Department Telephone Coordinators to place users

4  in the most optimized plan."  (*Id.*, Def.'s RJN Ex 1 at 4.)  But as alleged in the Complaint, these

5  reports were not the optimization reports required by the contracts, and in any event, they did

6  nothing to place City users in the most optimized plan.  (Compl. ¶ 98.)

7       **D.**    **The City May Plead Unjust Enrichment in the Alternative**

8       Finally, Verizon contends that the City's unjust enrichment claim should be dismissed

9  because, according to Verizon, it is based entirely on a breach of contract.  (MPA at 22.)  It is true

10  that a plaintiff may not proceed on an unjust enrichment claim where the subject of that claim is

11  covered by the parties' express agreements, and thus may not recover for both a breach of contract

12  and unjust enrichment.  *See Klein v. Chevron U.S.A., Inc.*, 202 Cal.App.4th 1342, 1389 (2002).

13  However, a plaintiff is free to plead both causes of action in the alternative.  *Id.*  ("a plaintiff may

14  plead inconsistent claims that allege both the existence of an enforceable agreement and the

15  absence of an enforceable agreement.").  That is precisely what the City did here.  While it remains

16  the City's contention an enforceable agreement exists, if this Court were to determine otherwise,

17  the City should still be able to recover under a claim of unjust enrichment.

18  **V.**    <u>**CONCLUSION**</u>

19       For the foregoing reasons, Verizon's motion to dismiss should be denied.  Should the Court

20  grant the motion to dismiss, the City should be granted leave to amend.  Fed. R. Civ. P. 15(a)(2)

21  ("The court should freely give leave when justice so requires."); *see also U.S. v. Webb*, 655 F.2d

22  977, 979 (9th Cir. 1981) ("Rule 15's policy of favoring amendments to pleadings should be

23  applied with 'extreme liberality.' ").

24  Respectfully submitted,

25  Dated: August 17, 2017            **COTCHETT, PITRE & McCARTHY LLP**

26

27                   By:    */s/ Adam M. Shapiro*
                           NIALL P. McCARTHY

28                             ERIC J. BUESCHER
                           ADAM M. SHAPIRO
                           *Attorneys for Plaintiff City of Los Angeles*



LAW OFFICES
Cotchett, Pitre &
McCarthy, LLP

**CITY OF LOS ANGELES'S OPPOSITION TO VERIZON'S MOTION TO DISMISS**       19